### PEOPLE v. CASSATA.

(Supreme Court, Appellate Division, First Department. June 5, 1896.)

1. CRIMINAL LAW—INSTRUCTIONS—COMMENTS ON EVIDENCE.
    In a homicide case, where defendant relied on a plea of self-defense, a charge which, read as a whole, could not but have impressed the jury with the court's view that the defense was shallow, suspicious, and unreliable, and by comments on the evidence tended to prevent them from determining controverted facts on their own responsibility, was erroneous.

2. HOMICIDE—SELF-DEFENSE—BURDEN OF PROOF.
    The burden of proof never shifts in a criminal case; and where defendant relies on a plea of self-defense on a trial for homicide it is error to charge that it is incumbent on defendant "to show, and to satisfy you beyond a reasonable doubt, that the act was justifiable under the rules of law which you have heard."

Appeal from court of general sessions, New York county.

Francesco Cassata was convicted of manslaughter in the first degree, and from the judgment of conviction appeals. Reversed.

The indictment charged the defendant with having, on the 4th day of February, 1895, shot and killed one Francisco Barcia. The defense on the trial was that the shooting was committed in self-defense, and it was claimed by the defendant, who was an Italian barber, that he, having taken the part of his brother-in-law, whom one Vincenzo Dorso claimed to have been intimate with his (Dorso's) wife, believed that Barcia, the deceased, who was Dorso's friend, had been sent by the latter to kill him. It was conceded that the defendant shot and killed the deceased, and the trial was mainly concerned with the plea of self-defense. In this, besides his own evidence, the defendant is supported by six other Italians, who, while differing in details as to the occurrence, agree upon the point that the deceased was the aggressor. Their testimony is that the deceased approached the defendant with a razor, the versions differing as to whether it was in a partly-opened case or fully out of the case and open; that the deceased, being unsuccessful in his attempt to harm the defendant with the razor, placed his hand in his hip pocket, where a revolver was subsequently found; that the defendant, seeing this movement, and believing his life to be in danger, being quicker than the deceased, drew a revolver and fired; that he then ran a few steps, and, being still

followed by the deceased, turned, and fired the second and fatal shot. It does not appear that prior to that time the defendant and the deceased had quarreled, or were very well known to each other, the evidence justifying an inference that they were utter strangers. The occurrence took place on the afternoon of February 4, 1895, shortly after 5 o'clock, in Elizabeth street, between Prince and Houston streets, and but a short distance from where the deceased lived.

The defendant testified that while he was standing on the sidewalk the deceased, who came from his shop, approached him, and said: " 'You take your brother-in-law part, and you got to die with your brother-in-law;' and he pushed me back, and pulled the razor; and then I saw a man try to grab him, and he shake that man, because he is bigger man than him, for Barcia is about six feet high. * * * I saw the man get hold of Barcia to separate him, and he said, 'Let go that man; he never do anything to you;' and Barcia say: 'No, that * * * got to die to-day. He don't go home any more.' * * * Then he tried to jump in front of me, and the time that he tried to jump in front of me he take the razor in his hand, and put it to the other hand, and then quick he put his hand in the back pocket like that [illustrating], and just as quick I put my hand in my pocket, and I was just too quick, and I shot him twice. * * * I never saw Barcia, and never had any gith to Barcia [probably meaning quarrel with him]; never in my life. * * * I never had a fight with Barcia, and that moment when he assault me I believed sure that Dorso sent Barcia to kill me." He further testified that he had heard of Barcia's past character or reputation for violence, and that when he fired the shot he believed that Barcia intended to kill him, and that he fired to protect and defend himself. The witness Franzone, after stating that the defendant was leaning against the wall, near to an entrance, testified that Barcia approached him, and said, "To-day I want to kill you," and that Cassata answered, "I have no business with you, because I don't know you." He further testified: "Then, as I knew both of them by sight, I requested Barcia, although I did not know him much, to leave alone Cassata; but Barcia the more insisted in threatening Cassata, and repeated, 'To-day I want to kill you.' Then Barcia, * * * passing a razor from the right hand to the left, pushed me, and then, spitting in the face of Cassata, said to him, putting his hand to his hip pocket—said, 'Now, you nauseous creature, loathsome fellow, son of a spy, I want to kill you,' and in saying so he put himself in the position of fronting Cassata, and, saying that, Cassata shot at him." That the position of the deceased's right hand at the time Cassata shot him was at his right-hand hip pocket. One Locacio, who was passing through the street, testified that he turned around, and saw the deceased with a razor in his left hand. "Then the deceased continued to spit in the face of the living, while the living one said: 'Please, leave me alone. I have a family. I have a wife, and I have also a mother, who depend upon me for their subsistence.' The deceased said to the living: 'You may go and do the work of spies.' And, after saying such words, he spat into his face. Then after spitting, he passed the razor from one hand into the other, and put the free hand behind to the pistol pocket. Then, in the moment after he put his hand to the pistol pocket, he again spat in the face of the accused, and it was in that moment that the accused had resort to the pistol." Another witness (Cusimano) testified: "I saw a man running after another man, and the other man going back. That other man, I guess, is going back, and the other man have something in his hand; I think a razor," which he could not use because it was not open. That, swearing at the defendant, the deceased put the razor in his left hand, and his hand in his back pocket, "and at the same time I heard the shot," and saw the deceased fall. One Di Carro testifies that he was inside his door, and saw that the parties were engaged in a wordy altercation, but could not understand what they said. "Then I saw that man Barcia have a revolver in his hand that way [illustrating]. The man Cassata was retreating; and in a moment I saw that Barcia changed hands with the razor. He put it from the right hand to the left, and then he brought his right hand to the back pockets; and I saw that when Cassata found himself with the shoulder at the wall, incapable of retreating further, that he shot; that he fired the shots, one after the other, in rapid succession."

Upon the part of the people the witnesses produced saw but little of the oc-

currence until after the shooting. One Mandi, a 14-year old boy, was the principal witness. He testified that he was on the west side of Elizabeth street, and, hearing a lot of people shouting, he looked across the street in time to see the first shot fired; but he saw nothing of the affair before that time. The defendant and deceased were then about two feet apart, facing each other, and the deceased was speaking to the defendant. There were a number of people gathered around, but the witness was unable to say whether there were as many as were in the jury box or not. After the first shot, defendant ran out into the street, and turned and ran in upon the sidewalk again, the deceased following him, and, upon the deceased's putting his hand to his hip pocket, the defendant fired the second shot, and the deceased fell. After the second shot, the defendant was going to run, but looked back, and saw the deceased fall, whereupon he dropped his pistol upon the body of the deceased, buttoned up his coat, put a cigar in his mouth, and started to run in the direction of Houston street, and was arrested by a policeman. The witness saw no razor, and only saw the revolver used by the defendant. John Forella, a boy of 15, was just turning the corner of Houston and Elizabeth streets, when he heard a shot, and looked and saw the defendant and deceased standing about two feet apart. The witness was then about 15 feet away. He was frightened, and ran to get into a saloon, and was within 5 feet of the men when the second shot was fired. The prisoner was then on the sidewalk, with his back to the house, and the deceased in the gutter. The witness saw no other pistol, and saw no razor at all. One Constantino was in his grocery store when he heard the first shot, but did not see the firing. He then leaned over his counter, and looked out, and could see the arm of a man holding a revolver, but not the whole body; and while he was looking the second shot was fired. The testimony of the two policemen who arrested the defendant was to the effect that when first arrested he denied having shot the deceased, and subsequently at the station house admitted it; that from the prisoner, when arrested, was taken a five-chambered revolver containing two exploded shells and three loaded cartridges; that they went back with him to where the body was lying, and in the hip pocket of the deceased they found a loaded revolver, and the top of a razor case was found at his feet, and a razor in the main part of the case was lying within about two feet of his head. This, with testimony showing that the deceased died from the effects of the shooting, completed the testimony for the people.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, O'BRIEN, and INGRAHAM, JJ.

William F. Howe, for appellant.
John D. Lindsay, for respondent.

O'BRIEN, J.　The failure of the prosecution to produce any witnesses to show what took place immediately preceding the shooting left the question as to whether it was or was not done in self-defense to be determined by the jury from the version given by the defendant and his six witnesses.　Unless they were entirely unreliable and unworthy of belief, or their testimony on its face bore the inherent marks of improbability, there was seemingly a clear preponderance of evidence to support the plea of self-defense.　According to the testimony of these witnesses, which is uncontradicted, it would appear that the defendant, while standing upon a public street, was suddenly accosted by the deceased, who, with a razor in a case or partly open, approached him in a threatening manner, and, after spitting in his face, told him in effect that he intended to take his life; that the deceased was a stranger to the prisoner, and that the latter believed that this unprovoked attack was the carrying out of a threat which had been made by one Dorso, with

whom the prisoner had had a quarrel that morning, and who had likewise threatened that he would compass the prisoner's death. Having been informed that the deceased was looking for him, he had some grounds for believing, from the attitude and manner, accompanied by the acts as testified to, with which the deceased approached him, that unless he could escape his life was in danger. He endeavored to pacify the deceased by saying he did not know him, and had no difference with him, but this, instead of quieting, seemed to increase, the anger of the deceased, which was not mitigated even by the attempt of a third person to interfere and separate them, and to dissuade the deceased from carrying out his repeated threat to take the life of the prisoner. The latter was near to the house, and the deceased was between him and the street, and the change of the defendant's position, with a view to running away, or removing his eyes from watching what the deceased was attempting to do with the razor, might have given the deceased the opportunity to do the very thing which the prisoner wished to prevent. Failing to accomplish his purpose with the razor, because interfered with, the deceased placed his hand on his right hip pocket, wherein it was subsequently found he had a revolver, and it was at that moment that the defendant, believing, as he says, that unless he protected himself, he would be shot by the deceased, reached for his own pocket, in which he also had a revolver, and, being quicker than the deceased, fired the first shot, and then ran into the street, where, according to one of the witnesses for the people and some of the defendant's witnesses, the deceased followed him, and, fearing that he would be overtaken, he turned, and fired the second and fatal shot. It will thus be seen that the great preponderance of evidence seemingly supported the defendant's version that he endeavored to avert a quarrel, and, upon failing in this, and unable to find a means of escape, he in self-defense fired the first shot, and, upon then running and being pursued by the deceased, he turned, actuated by the same motive of protecting his life, and fired the second time. There was no attempt to show that any of the persons produced by the defendant were not credible witnesses; and while they do not all agree exactly in the details as to just what was said, and vary somewhat in their versions as to the positions occupied by the prisoner and the deceased, respectively, during their preliminary quarrel, they all agree on the substantial points that, without provocation, the deceased was the aggressor, provoking a quarrel, and approaching the defendant in a manner and in an attitude which was some ground for his belief that it was necessary to defend himself. Nor do we find any inherent improbability in the defendant's version. As conceded, the deceased and defendant were utter strangers to each other, and we are therefore to assume that, upon the deceased's approaching the defendant or moving in his direction, the defendant was guilty of a wanton, unprovoked, and causeless murder, or we must assume that it was preceded by a quarrel such as has been detailed, and which led up to the shooting. In addition, we have the fact, which is entitled to some weight, that the defendant was a man of peaceable character, while the deceased was a man of violent and quarrelsome disposition; and, be-

ing a large, strong, well-preserved man in appearance, he was not a person whom one would be likely without cause to incite to a quarrel. The defendant's version, moreover, is not only probable, but it alone furnishes some reasonable motive for the shooting, which otherwise is absent; for the prosecution concedes that it is unable to assign any motive for the killing, and has been unable to produce any witnesses directly assailing the defense. It is true that, where all the elements of a crime are made out, it is not necessary to show motive. And so, when the people rested, after having proved that the deceased was shot by the defendant, the learned judge very properly held that, without proof of motive, the defendant was put to his defense. But in determining the truth of different versions connected with an alleged crime, motive has an important bearing, and should always be considered; because our experience tells us that people do not ordinarily cheat or steal or murder without a motive, and our first·impulse when we hear or read of a crime is naturally to seek for a motive. These considerations, however weighty, still left the question of whether the plea of self-defense was made out one for the jury. The weight of evidence where there is conflict, the character of the witnesses and their credibility, are questions clearly within the province of the jury; and, though the prosecution was outweighed in the number of witnesses, this would not justify our interference with the verdict if reached after legal instructions which preserved the prisoner's rights. As said in People v. Cignarale, 110 N. Y. 27, 17 N. E. 135:

"It is a cardinal principle in our jurisprudence that the jury is the ultimate tribunal for the investigation and determination of questions of fact. It is no more the province of an appellate court than of the court of original instance to determine controverted questions of fact arising upon conflicting evidence. Neither can lawfully usurp the appropriate functions of the jury, and neither can substitute its own judgment for that of the jury, where the facts are reasonably capable of diverse or opposing inferences."

We should not, therefore, upon the ground that the verdict is against the weight of evidence, set it aside.

Where, however, the defense was so strongly supported, and the question of guilt so close, we cannot conclude that errors in the charge or in rulings upon evidence were harmless. Among others assigned as errors, our attention is called by appellant to that part of the record where the learned trial judge, in commenting upon the defendant's testimony that he (defendant) saw a man trying to grab the deceased, said:

"That man has not been produced here. There is no evidence whatever, excepting the defendant's statements regarding that man. The defendant testified: 'I saw the man get hold of Barcia, to separate him,' and he said, 'Let go that man; he never did anything to you,' and Barcia said: 'No, that * * * got to die to-day. He don't go home any more.' Of course, if the man who interfered—if he did interfere, and if there was such a man—was brought forward, and was put on the witness stand, and if he told the jury what has been testified to here by the defendant, it would aid you very much in arriving at a determination of this case, and would very much enlighten your understanding of the circumstances, because, if there was such a man, and if he tried to separate the defendant and the deceased, and said, 'Let go that man; he never did anything to you,' why it follows, gentlemen, that some third party came in between this defendant and the deceased, and,

this defendant having heard the threat of the deceased, and having seen the deceased armed with a dangerous weapon, a razor, and this defendant having testified that he had knowledge of his reputation for violence, it is for you to say whether this defendant, being innocent of any quarrel with the deceased, being innocent of any wrong himself, being without evil himself, believed his life to be in danger, and that danger could not be avoided. I charge you that, if this third person were present, and he interfered in behalf of the defendant, and expostulated with Barcia, and then, on a public street, an opportunity was presented to this defendant to avoid a quarrel, or to discontinue a quarrel, and to retreat and escape or go away from the scene with safety to himself, he was bound to do so."

From this instruction the jury could not but have been impressed with the view which the learned trial judge undoubtedly entertained,—that there was no evidence that a third man interfered between the defendant and the deceased, or of the defendant's having endeavored to retreat to avoid the quarrel. He evidently, for the moment, had forgotten the testimony of Franzone that he interfered between the parties, as well as that of the witness Locacio, who states that he saw Franzone endeavoring to separate them. And, in addition to the defendant's testimony, we have the evidence of two witnesses that the deceased had driven the defendant up against the wall, and that at the time further retreat was impossible; and that, when the opportunity was present, and before firing the second or final shot, he endeavored, by running away, to escape the deceased. Whether credible or not, the defendant was entitled to the benefit of the testimony adduced, and its value was entirely a question for the jury. While it is no doubt the right and duty of the trial judge to summarize the testimony, and endeavor to present it in such a form to the jury that they can have all the questions bearing thereon before them, a statement by him, in effect, that there was no evidence but the defendant's upon two salient questions, when such in fact existed, could not but be prejudicial to the prisoner. That the defendant had any quarrel with or grievance against the deceased was not shown, and there was, therefore, an absence of proof of motive upon the defendant's part to kill Barcia; and, the fact of the killing being conceded, if the other ingredients of the crime were established as already said, motive was unimportant. But the defense to what otherwise would appear to have been a wanton, unprovoked killing was attempted to be furnished by the defendant's testimony and that of his other witnesses as to the manner in which he was assaulted, and the belief he was under as to the reason which actuated the deceased in making the attack, namely, the belief that Dorso had incited the deceased to kill him; and, after testimony showing that on that day he had been informed that the deceased was looking for him, the defendant endeavored to show what occurred between himself and Dorso, which, in addition to other circumstances detailed, induced his belief in the deceased's murderous intent. Notwithstanding the exclusion of the evidence thus offered of what occurred between the defendant and Dorso, the learned trial judge thus commented upon the absence of testimony on this point:

"There is absolutely no evidence that there was any connection between Dorso and Barcia, the deceased, or that Barcia and Dorso had any communi-

cation about this defendant. There is absolutely no evidence of that; nor is there any evidence whatever to show on what grounds this defendant based his belief that Dorso had sent Barcia to kill him; and I charge you that the mere statement, the arbitrary statement of a defendant, pleading justifiable homicide as a defense for the taking of human life, that he believed that the deceased was going to kill him, is not sufficient before a jury, unless he assigns some grounds upon which to rest his belief, and upon which a jury can pass, as to whether they be reasonable or unreasonable."

While great latitude and discretion must necessarily rest with the trial judge in commenting upon evidence in his charge to the jury, the rule, as stated in Sindram v. People, 88 N. Y. 196, has been often cited with approval, that:

"It is desirable that the court should refrain as far as possible from saying anything to the jury which might influence them either way in passing upon the controverted questions of fact, and perhaps comments on the evidence might be carried so far as to afford ground for assigning error."

It would serve no useful purpose to quote further from the instructions given to the jury, because, read as a whole, they could not but have impressed the jury with the court's view that the defense was shallow, suspicious, and unreliable. And this course, we think, should always be avoided, because it is likely to prevent the jury from determining, as is their province, upon their own responsibility, controverted questions of fact. But, passing from the facts to the law, in speaking of reasonable doubt, the learned trial judge said:

"You must hold the scales fairly and evenly, and you must bear in mind that of the two men engaged in that transaction one of them speaks for himself, while the other's voice is stilled in death; that that death was caused by this defendant; and that it is for this defendant to show and to satisfy you beyond a reasonable doubt that the act was justifiable, under the rules of law which you have heard."

It is a settled rule of law that the burden of proof in a criminal case never shifts, and the people are bound to make out a case against the prisoner beyond a reasonable doubt. In People v. Riordan, 117 N. Y. 71, 22 N. E. 455, Andrews, J., writing the opinion of the court of appeals, said:

"The rule that in criminal cases the defendant is entitled to the benefit of a reasonable doubt applies not only to the case as made by the prosecution, but to any defense interposed."

And in the same case, at general term (3 N. Y. Supp. 774), Mr. Justice Martin, writing the opinion, said:

"It seems to us quite clear that by this the jury was led to understand that the burden of proof rested upon the defendant to establish the fact that he killed the deceased while acting in self-defense, and that he was required to establish that fact beyond a reasonable doubt, or at least by a fair preponderance of evidence. The tendency, and we think the natural result, of this portion of the charge was to inspire in the minds of the jury the belief that when the people had established a prima facie case by proving the killing of the deceased, that the law then imposed upon the defendant the burden of satisfying them affirmatively that he acted in self-defense. The vice of this charge rests in the fact that by it the obligation of showing affirmatively that the homicide was committed under such circumstances as to excuse or justify it was imposed upon the defendant; while under the authorities in this state the burden of proving, not only that a human being has been killed, but also that the killing was perpetrated under such circum-

stances as constituted the crime charged, is imposed upon the prosecution, and the burden of establishing and maintaining those facts remains with the prosecution throughout the case."

And in People v. Hill, 49 Hun, 432, 3 N. Y. Supp. 564, it was said: "The burden of proving that the act complained of was committed under such circumstances as to constitute a crime is never changed. It always rests upon the prosecution; and if, upon the whole evidence upon both sides, a reasonable doubt exists as to the guilt of the defendant, he is entitled to the benefit of it. We think the charge of the learned judge in this case is directly in conflict with the rule just stated, and that for such error the judgment and conviction in this case must be reversed."

Without discussing the other exceptions relied upon, we think, upon an examination of the entire record, that the defendant is entitled to a new trial, and the judgment of conviction is accordingly reversed, and a new trial ordered.

VAN BRUNT, P. J., and BARRETT and RUMSEY, JJ., concur. INGRAHAM, J., concurs in result.